UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WALTER CHAD TROUTMAN, | § | No. 1:14–CV–986–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WILLIAMSON COUNTY AND ITS SHERIFF'S DEPARTMENT, | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

ORDER ADOPTING THE MAGISTRATE'S
REPORT AND RECOMMENDATION

Before the Court are Plaintiff Walter Chad Troutman's Objections (Dkt. # 41) to Magistrate Judge Andrew W. Austin's Report and Recommendations (Dkt. # 40) regarding Defendant Williamson County's Motion for Summary Judgment (Dkt. # 21). Defendant filed a response to the Objections on February 25, 2015 (Dkt. # 42). Pursuant to Local Rule 7(h), the Court finds this matter suitable for disposition without a hearing. After reviewing the Objections and the supporting and opposing memoranda, the Court **ADOPTS** the conclusions of the Report and Recommendation, for the reasons stated below. (Dkt. # 40.)

BACKGROUND

I. Factual Background

This case arises from Walter Chad Troutman's September 11, 2013, termination by a unanimous vote of the Disciplinary Review Board of the Williamson County Sheriff's Office. (Dkt. # 1 ¶ 20.) Troutman had been an employee of the Williamson County Sheriff's Office since 1997. (Id. ¶ 9.)

He states that he has suffered from sleep apnea, a respiratory disorder which causes him to stop breathing at certain points in his sleep cycle, since the mid-to-late 1990s. ("Troutman Dep.," Dkt. # 35, Ex. A at 15:12–26.) He was formally diagnosed some time in 2003 or 2004. (Id. at 13:16–14:2.) According to Troutman, his sleep apnea makes it difficult to sleep deeply, and he frequently feels fatigued during the day. (Id. at 16:2–17:9.) In 2005, Troutman states that upon the advice of his doctor, he requested permission from Sergeant Carmona, his supervisor at the time, to take the stimulant Ritalin to combat his fatigue. (Id. at 76:19–77:22.) After checking with the chain of command, Sergeant Carmona denied permission to take the medication. (Id. at 77:1–6.)

Plaintiff had multiple supervisors during the time he has suffered from sleep apnea. Prior to approximately 2005, Sergeant James David was Troutman's supervisor. (Troutman Dep. 78:20–79:11.) Around 2005, Sergeant Carmona became Troutman's supervisor. (Id. 76:13–17.) At some point after that, Sergeant

David Denson supervised Troutman (id.); Sergeant Kelly Bomer, who was Troutman's supervisor when he was terminated from employment, assumed the position in October 2012. (Id. 83:4–7.)

Troutman did not have a perfect record during his employ with Williamson County. During his deposition, he testified that in 2005 he was disciplined for falling asleep behind the wheel of a moving vehicle. ("Troutman Dep. 2," Dkt. # 21, Ex. A, at 98:13–99:21.) The same year, he was disciplined for taking his wife's prescription medication. (Id. at 99:22–100:6; 11:13–23.) In 2006, Troutman was disciplined for making frequent stops at his residence while on duty. (Id. at 100:7–12.) In 2011, Troutman was disciplined for running a fleet vehicle into a gate, damaging the vehicle. (Id. at 100:25–101:15.)

In early 2012, Kevin Jones filed suit against Defendant after being dismissed from employment. (Dkt. # 1 ¶ 12.) Plaintiff states in his complaint that Williamson County's Internal Affairs interviewed him regarding Jones' complaint. (Id.) However, Plaintiff states that he spoke only to Mr. Jones about his lawsuit, and never spoke with Jones' attorney, nor did he testify or agree to testify or otherwise participate in Jones' suit. (Troutman Dep. at 80:16–85:10.)

In October, 2012 when Sergeant Bomer began supervising Troutman's department, she sent a memorandum to all her officers outlining her expectations. (Dkt. # 21, Ex. D.) Sergeant Bomer's memorandum states that she

expects officers to arrive to work at 0545, call in sick via phone, wear a wrinkle-free uniform with shined boots, and be proactive in filing their reports and conducting investigations. (Id.) Sergeant Bomer disciplined Troutman five times in the spring of 2013 for failure to meet these expectations. Specifically, she disciplined Troutman for (1) failure to timely report a felony offense[1] (Dkt. # 21, Ex. E); (2) failure to properly document a "hold" placed on a vehicle after impoundment[2] (Dkt. # 21, Ex. F); (3) mishandling evidence on two occasions[3] (Dkt. # 21, Ex. G at 1); (4) failure to submit a time sheet, and informing Sergeant Bomer that he submitted the sheet when he in fact did not (id. at 2); (5) arriving to

---

[1] According to the report, Troutman responded to a report of prior assault on February 25, 2013, but did not complete the report until the next day, in violation of policy. (Dkt. # 21, Ex. E.) Troutman states that he did not submit the report late, and believes the late delivery of the report was due to a computer error. (Troutman Dep. 2 at 106:4–107:18.)

[2] Troutman does not believe this failure was discipline-worthy, as he alleges at least some other officers follow the procedure Troutman used without being disciplined. (Troutman Dep. 2 at 108:12–109:9.)

[3] In one instance, Troutman received evidence in connection with a reported crime on April 8, 2013, but did not submit the evidence until May 1, 2013. (Dkt. # 21, Ex. G, ¶ 1.) In the other instance, Troutman handled the evidence from an April 13, 2013 incident without gloves, and did not submit the evidence until May 1, 2013. (Id.) At that point, Troutman submitted the evidence to the detective on the case rather than submitting it using the proper protocol. (Id.) Troutman's failure to follow protocol prevented the evidence from being processed.

work in a wrinkled uniform shirt on one occasion and oversleeping and arriving late to work (id. at 3).[4]

On May 6, 2013, Lieutenant Tony Carter, Sergeant Bomer's supervisor, sent a memorandum to Captain Mike Gleason listing specific reasons, including those for which he had recently been written up, why Troutman's performance was unsatisfactory. (Dkt. # 21 at 9.) On May 10, 2013, Troutman met with his supervisors and agreed to certain disciplinary measures, including three days without pay, a prohibition on Off Duty Employment or Elective Overtime for six months, and a six month Personal Improvement Program conducted by Sergeant Bomer. (Dkt. # 21, Ex. I, at 1.) Sergeant Bomer wrote a detailed evaluation of Troutman's progress on his personal improvement plan on June 18, 2013 and noted that his performance had improved to an acceptable level in many areas, but still required consistent improvement. (Dkt. # 21, Ex. J.) However, on July 5, 2013 Sergeant Bomer filed an official complaint against Troutman because he called in a last-minute absence to work, stating he needed to attend a medical appointment with his mother, and later admitted that he had not been truthful, and that he took the day off because he was tired and concerned

[4] Troutman's write-up states: "While I understand that upon occasion oversleeping can occur, this has happened at least 3 times in the past several months and it is not acceptable." (Dkt. # 21, Ex. G ¶ 1.) Troutman contends that this was not a proper subject for discipline, but never says that the contents of the report are untrue. (Troutman Dep. 2 at 115:8–116:14.)

about money. (Dkt. # 21, Ex. K at 2, 4–5.) Sergeant Bomer expressed concern that Troutman's untruth violated the Williamson County General Orders Rules of Conduct, section 200-001 # 37. (Id. at 1.) On September 11, 2013, the Disciplinary Review Board reviewed the complaint, and unanimously voted to terminate Troutman. (Dkt. # 21, Ex. B.)

Plaintiff brought suit against Williamson County, alleging that his termination was a discriminatory discharge in violation of the Americans with Disabilities Act, and further alleging that his discharge was motivated by a retaliatory purpose based upon his purported support of former Deputy Jones, in violation of Chapter 21 of the Texas Labor Code. (Dkt. # 1 ¶¶ 12, 22–25.)

## LEGAL STANDARD

### I. Review of a Magistrate Judge's Memorandum and Recommendation

Any party may contest the Magistrate Judge's findings by filing written objections within fourteen days of being served with a copy of the Memorandum and Recommendation. 28 U.S.C. § 737(b)(1)(C). The objections must specifically identify those findings or recommendations that the party wishes to have the district court consider. Thomas v. Arn, 474 U.S. 140, 151 (1985). A district court need not consider "[f]rivolous, conclusive, or general objections." Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987) (quoting Nettles

v. Wainwright, 677 F.2d 404, 410 n. 8 (5th Cir. 1982), overruled on other grounds by Douglass v. United States Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996)).

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected. See 28 U.S.C. § 636(b)(1)(C) ("[A] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

Here, Plaintiff objects to both major conclusions reached by the Magistrate: that he has failed to meet his summary judgment burden to prevail on a discrimination claim or a retaliation claim. (Dkt. # 41.) Specifically, Plaintiff objects to the Magistrate's conclusion that he failed to meet his burden to demonstrate that Defendant's non-discriminatory reasons for taking adverse employment actions against him were pretextual (id. ¶ 7); that he failed to establish the first and third elements of a prima facie case of retaliation (id.); and that Sergeant David Denson's statements related to Plaintiff's retaliation claim are inadmissible hearsay (id.). Defendant objects to the finding that Troutman is disabled under the ADA due to his sleep apnea. (Dkt. # 42 at 8.)

## II. Motion for Summary Judgment

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue exists, the Court "may not make credibility determinations or weigh the evidence." Tibler v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In an ADA discrimination claim, "all facts and interferences" should be construed "in the light most favorable to the nonmovant,

and [the Court] will not weigh evidence or evaluate the credibility of witnesses." E.E.O.C. v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 615 (5th Cir. 2009) (citing Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001)).

## DISCUSSION

### I. ADA Discrimination Claim

Troutman's first claim against Williamson County is that his dismissal was based upon disability discrimination. The ADA prohibits employers from discriminating against a "qualified individual with a disability on the basis of that disability." 42 U.S.C. § 12112(a). At the summary judgment stage, a plaintiff alleging disability discrimination must first establish a prima facie discrimination claim under the ADA by proving "(1) he is disabled within the meaning of the ADA, (2) he is qualified and able to perform the essential functions of his job, and (3) his employer fired him because of his disability." Kemp v. Holder, 610 F.3d 231, 235 (2010); see also Zenor v. El Paso Healthcare Sys., Ltd., 176 F.3d 847, 853 (5th Cir. 1999). Where the plaintiff is able to make out a prima facie case, "an inference of intentional discrimination is raised and the burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action." Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009). If the defendant is able to offer a legitimate, nondiscriminatory explanation for firing the employee, "the burden shifts back to

the employee to demonstrate that the employer's explanation is merely a pretext." Id. (citing McDonnell Douglas Corp v. Green, 411 U.S. 792, 802 (1973)).

A. Whether Plaintiff established prima facie case

1. Whether Plaintiff demonstrated that he is disabled

"As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability." Waldrip v. Gen. Elec. Co., 325 F.3d 652, 653 (5th Cir. 2003) (quoting Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 758 (5th Cir. 1996)). A disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual . . ." Kemp, 610 F.3d at 235. The Court bears a "statutory obligation to determine the existence of disabilities on a case-by-case basis." Waldrip, 325 F.3d at 655 (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999)).

When determining whether plaintiff's sleep apnea constitutes a disability, it is necessary to first establish that sleeping is a "major life activity," the type of activity that is "of central importance to daily life." Waldrip, 325 F.3d at 655 (quoting Bragdon v. Abbott, 524 U.S. 624, 638 (1998)). With regards to sleeping, this is beyond disagreement; some individuals spend a third or more of their lives sleeping, and there are major industries devoted to helping individuals get a restful night's sleep. Accordingly, sleeping is unquestionably a major life

activity. See Chevron Phillips, 570 F.3d at 616 ("Every circuit that has addressed the issue has concluded that sleeping is a major life activity.").

However, "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA." Chevron Phillips, 570 F.3d at 614. Accordingly, Plaintiff bears the burden of establishing that his sleep apnea, an impairment which affects sleeping, "*substantially limits* [this] major life activity." Id. (emphasis added); see also Waldrip, 325 F.3d at 655. While not controlling, as a case-by-case determination is required when determining whether a plaintiff has established the presence of a disability, other courts considering plaintiffs suffering from sleep apnea have consistently found that it is not a disability. See, e.g. Matthews v. City of Houston Fire Dept., 609 F. Supp. 2d 631, 648 (S.D. Tex. 2009) (finding plaintiff who presented no evidence "to suggest that her sleep apnea substantially limits 'either a class of jobs or a broad range of jobs in various classes,'" was not disabled for purposes of an ADA discrimination claim (quoting Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir. 1995)); Taylor v. Blue Cross and Blue Shield of Tex., Inc., 55 F. Supp. 2d 604, 611 (N.D. Tex. 1999); Grubb v. Southwest Airlines, 296 Fed. App'x 383, 388 (5th Cir. 2008).

Plaintiff has not satisfied his burden to show that his particular case of sleep apnea substantially burdened his ability to sleep. Troutman alleges that he has issues with arriving to work on time because of his sleep apnea, and this Court

can infer that he was also tired at work, because he once requested permission to take a stimulant on the job. (Troutman Dep. at 76:19–79:3.) However, Troutman presents no evidence that his sleep apnea substantially affects his ability to sleep, as he must, to support a finding that he suffers from a disability under the ADA.

2. Whether Plaintiff demonstrated that he was qualified for his job

The second element of a prima facie discrimination claim requires a plaintiff to show that he was qualified for his job at the time he was fired. A plaintiff can show that he was qualified for his job by demonstrating either that he (1) "could 'perform the essential functions of the job in spite of [his] disability,' or, if [he] could not, (2) that 'a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." E.E.O.C. v. LHC Group, Inc., 773 F.3d 688, 697 (5th Cir. 2014) (quoting Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1093 (5th Cir. 1996)). "A function is 'essential' if it bears 'more than a marginal relationship to the employee's job." LHC Group, Inc., 773 F.3d at 697 (quoting Chandler v. City of All., 2 F.3d 1385, 1393 (5th Cir. 1993)).

Importantly, "once the employee presents a request for an accommodation, the employer is required to engage in [an] interactive process so that *together* they can determine what reasonable accommodations might be available." LHC Group, Inc., 773 F.3d at 700 (quoting Chevron Phillips, 570 F.3d at 622). However, the employee must actually request an accommodation. Id.

(finding that plaintiff had met her burden to show that her employer failed to provide a reasonable accommodation because she "expressly reached out to her supervisors, indicating that she wanted temporary help").

Troutman alleges that he informed each of his supervisors that he suffered from sleep apnea. (Troutman Dep. at 76:19–78:23.) At some time before 2005, Troutman explicitly told Sergeant James David that he "had a tendency to sleep very hard and it was hard for [him] to hear the alarm clock," occasionally causing him to run late. (Id. 78:20–79:9.) Troutman only recalls specifically requesting accommodation for his sleep apnea on one occasion in 2005, when he sought and was denied permission from Sergeant Carmona to take Ritalin. (Troutman Dep. at 76:19–78:23.) Viewing the summary judgment evidence in the light most favorable to the Plaintiff, Williamson County did not provide Troutman with accommodations for his sleep apnea in 2005. However, Troutman also retained his employment despite his unaccommodated sleep apnea during 2005.

Troutman has no recollection of making any accommodation requests for his sleep apnea since 2006. (Id. 79:12–29:15.) Further, Troutman had the "responsibility of informing [his] employer" of his need for an "adjustment in working conditions or duties" due to his medical condition. Chevron Phillips, 570 F.3d at 621. Without satisfying this responsibility, he cannot allege that he was not afforded reasonable accommodations for his disability that would enable him "to

perform the essential functions of the job." LHC Group, 773 F.3d at 697 (quoting Turco, 101 F.3d at1093). Based on the evidence Troutman himself presented, he never affirmatively requested an accommodation for his sleep apnea from Sergeant Boman, his supervisor at the time he was dismissed.

In spite of Troutman's failure to request accommodations after 2006, there is no genuine issue of material fact that he "could 'perform the essential functions of the job in spite of [his] disability.'" LHC Group, Inc., 773 F.3d at 697 (quoting Turco, 101 F.3d at 1093). Troutman began suffering from sleep apnea as early as the mid-1990s, yet was employed by the Sheriff's department from 1997 until 2013. Accordingly, the Court finds there is no genuine issue of material fact that Troutman was qualified to perform his job in spite of his sleep apnea; Troutman has satisfied the second prong of the prima facie disability discrimination test.

3. Whether Plaintiff's sleep apnea caused an adverse employment decision

Finally, in order to establish a prima facie case for disability discrimination, a plaintiff must show that there was a causal nexus between the adverse employment decision and his disability. LHC Group, Inc., 773 F.3d at 700 (finding that plaintiff met her burden to prove nexus because she demonstrated that: (1) her job performance was criticized only after she had a grand mal seizure; (2) she produced evidence that criticisms of her performance were "exaggerated,

unfounded, or fabricated;" and (3) she submitted multiple statements by her supervisor indicating that her disability rendered her unfit for her job); see also Chevron Phillips, 570 F.3d at 612 (finding that plaintiff, who produced written evidence that her employer's immediate reaction to her request for disability accommodations was to determine whether she could be terminated, had made a prima facie case for disability discrimination).

Troutman has not established a nexus between his dismissal and his alleged disability. The record reflects that Troutman exhibited performance issues throughout his time with Williamson County—both when his supervisors were aware of his sleep apnea, and when they were not. Prior to the July 5, 2013 incident, Troutman was written up for numerous offenses that Troutman does not connect to his sleep apnea or the side effects of sleep apnea. For example, Troutman does not state that he mishandled evidence or submitted a late felony offense report because he was too fatigued by his sleep apnea to work. Further, there is no indication in the summary judgment record that Sergeant Bomer understood the extent of Troutman's sleep apnea, or that Troutman ever spoke to her to request accommodation for his sleep apnea. (Troutman Dep. at 76:19–78:23.)

Accordingly, even Troutman's write-up for over-sleeping and arriving to work in a wrinkled uniform cannot be connected to a disability discrimination

claim, because there is no evidence that Sergeant Bomer understood Troutman's alleged disability. Finally, the behavior for which Troutman was ultimately terminated, lying to a supervisor, cannot be connected in any way to sleep apnea. Accordingly, Troutman has not demonstrated a nexus between his termination and his dismissal, and fails to satisfy the third prong of the prima facie case for disability discrimination.

At the summary judgment stage, failure to make a prima facie case for disability discrimination entitles Defendant to summary judgment on the issue. Kemp, 610 F.3d at 235. Summary judgment is **GRANTED** to Williamson County on Troutman's disability discrimination claim.

II. Retaliation Claim

Troutman also claims that his dismissal was retaliatory, and that he was fired for supporting Deputy Jones' discrimination case against Williamson County in violation of Chapter 21 of the Texas Labor Code. An employer violates the Texas Labor Code if he "retaliates against a person who (1) opposes a discriminatory practice . . . or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." Tex. Lab. Code. § 21.055. To establish a prima facie case of retaliation, a plaintiff must show "1) that he is engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action."

Pineda v. United Parcel Service, Inc., 360 F.3d 483, 487 (5th Cir. 2004); see also Gorman v. Verizon Wireless Tex., LLC, 753 F.3d 165, 170 (5th Cir. 2014). If a plaintiff fails to make a prima facie case, summary judgment on the issue is appropriate. Each of these elements will be evaluated below.

A. Whether Troutman was engaged in protected activity

"An employee engages in a protected activity when she 'opposes a discriminatory practice,' 'makes or files a charge,' 'files a complaint,' or 'testifies, assists, or participates in any manner in an investigation proceeding, or hearing." San Antonio Water System v. Nicholas, 461 S.W. 3d 131 (Tex. 2015) (quoting Tex. Lab. Code § 21.055). Troutman has not presented any evidence that he engaged in any of the above-mentioned protected activities in connection with Deputy Jones' discrimination case. While Troutman testifies that he spoke with Deputy Jones specifically regarding the handling of a domestic violence call and a mental health call, he does not testify that he spoke up on Jones' behalf after witnessing discriminatory behavior. (Troutman Dep. 80:16–81:6.) Further, Troutman does not he allege that he filed a complaint on Jones' behalf or participated in any proceedings on Jones' behalf. Accordingly, Troutman has not satisfied the first prong of the prima facie test for retaliation.

B. Whether an adverse employment action occurred

Troutman was terminated from his position. This is certainly an adverse employment action. Regardless of the cause for his termination, the second prong of the prima facie test is satisfied.

C. Whether there was a causal link between the protected activity and the adverse action

A plaintiff alleging retaliation under § 21.055 must demonstrate "that 'but for' [employer's] discriminatory conduct he would not have been fired." Pineda, 360 F.3d at 488. Troutman entirely fails to meet that burden here. While Troutman does state that other officers were not disciplined for engaging in certain, similar offenses, such as a failure to properly document a hold on an impounded vehicle (Troutman Dep. 2 at 108:12–109:18, 111:13–17), he agrees that he was validly disciplined for other behaviors, including mishandling evidence (id. 114:18–115:6). Further, Troutman himself wrote a statement admitting to the behavior which ultimately lead to his unanimous termination by a five-person disciplinary review board. (Dkt. # 21, Ex. K at 4–5.)

The only evidence Troutman presents that make any connection between retaliation and his termination are two statements he made during his deposition: Troutman stated that when Sergeant Denson was his supervisor, he said "Lieutenant Carter had warned him about talking to me . . . because Carter felt that I was speaking to Kevin and his attorneys and investigators regarding this case

(Troutman Dep. at 81:15–19); he also testified that Sergeant Bomer informed him that Lieutenant Carter, her supervisor, told her to write up all of Troutman's performance issues (id. at 57:18–58:25). While Williamson County argues that Sergeant Denson's statement is inadmissible hearsay, the issue need not be addressed; even if the statement were found admissible, it would not be sufficient to show that Troutman's association with former Deputy Jones was the "but for" cause of his termination. Troutman could have been fired solely on the basis of Sergeant Bomer's July 5, 2013 complaint, supported by his own affidavit admitting he lied to get a day off work when he could have simply asked for the day off. Accordingly, Troutman fails to produce evidence to establish the first and third prongs of a prima facie case for retaliation, and summary judgment is proper as to Defendant on this claim.

## CONCLUSION

For the reasons stated above, the Court **ADOPTS** the conclusions of the Magistrate Judge's Report and Recommendation (Dkt. # 41). The Defendant's Motion for Summary Judgment (Dkt. # 21) is **GRANTED** and the Court **ORDERS** this case **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**DATE:** Austin, Texas, March 30, 2016.

David Alan Ezra
Senior United States Distict Judge